IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEREMY ROUSH, Administrator | ) | CASE NO. _____ |
| Estate of Cheryl Roush, Deceased | ) | |
| 701 N. Park Avenue | ) | JUDGE _____ |
| Warren, OH  44483 | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHERN SOUTHERN RAILWAY | ) | |
| COMPANY | ) | |
| c/o | ) | |
| ILLINOIS CORPORATION SERVICE CO. | ) | |
| 801 Adlai Stevenson Drive | ) | |
| Springfield, IL  62703-4261 | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF THE CASE**

1. Plaintiff is the duly appointed Administrator of Estate of Cheryl Roush, Deceased, and brings this wrongful death action pursuant Ohio Revised Code §2125.02 for damages resulting from the derailment of a Norfolk Southern train on or about February 3, 2023, in East Palestine, Ohio (the "Derailment"), which caused the release and combustion of toxic chemicals leading to Cheryl Roush's injuries and subsequent death.

2. Defendant Norfolk Southern Railway Company ("NSRC") is a Virginia corporation with its principal place of business in Atlanta, Georgia. NSRC. It is a wholly owned subsidiary of NSC.

3. NSRC operates approximately 19,300 route miles in 22 states and the District of Columbia and serves every major container port in the eastern United States.

1

4. According to the Federal Railroad Administration ("FRA"), NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 67 accidents total -- 22 in 2019, 18 in 2020, 15 in 2021 and 13 in 2022.

5. According to the FRA, NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 74 total accidents (89.2% of all --derailments in Pennsylvania) from 2019 to 2022−23 in 2019, 14 in 2020, 23 in 2021, and 14 in 2022.

6. At all relevant times, NSC and NSRC acted individually, as well as by and through one another and its respective officers, directors, executives, employees, contractors, , and/or agents. Collectively, Defendant NSC and NSRC will be identified as "Norfolk," Norfolk Southern," or "Defendant."

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. §1331(a) as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states. Plaintiff is a citizen and resident of Ohio. Defendant is a citizen of Virginia and Georgia.

8. Venue is proper under 28 U.S.C. §1391(b) as a substantial part of the events, acts and omissions giving rise to the claims herein occurred in this district.

9. Plaintiff was not part of any class action settlement related to the Derailment.

## FACTUAL ALLEGATIONS

**Derailment of Train 32N**

10. On Friday February 3, 2023, Norfolk Southern Freight Train 32N ("Train 32N") was traveling from Madison County, Illinois, to Conway, Pennsylvania.

11. Defendant operates a hot bearing detector ("HBD") sytem that transmits an audible alarm to the train crew to slow and/or stop the train to inspect a hot axle.

12. A wheel bearing on Train 32N's 23rd railcar recorded a temperature of 38 degrees Fahrenheit above ambient temperature at milepost 79.9.

13. The next HBD Train 32N passed, located at milepost 69.01, recorded that the same bearing's temperature had reached 103 degrees Fahrenheit above ambient temperature.

14. As Train 32N passed a third HBD at milepost 49.81, the wheel bearing on railcar 23 reached a temperature of 253 degrees Fahrenheit above ambient temperature. According to Defendant's own policies, any reading above 170 degrees requires the train crew to stop the train. Defendant considers any reading over 200 degrees "critical."

15. Video footage from around this time shows one of the railcars of Train 32N sparking in the wheel bearing and axle area. A former Norfolk train engineer who viewed the video explained:  "That was a telltale sign 'cause there's so much pressure, so much on that bearing, it won't last long sparking that hot that much.'"

16. Before the full train derailment occurred, a mechanical defect alarm alerted the crew to the malfunctioning railcar axle. In addition, Train 32N had broken down at least once earlier that same evening along the same route prior to the wheel bearing overheating.

17. An emergency brake was applied Train 32N workers became aware of these malfunctions, but before the full Derailment occurred.

18. Around 8:55 p.m. on February 3, 2023, the overheated wheel bearing caused railcar 23's axle to fail, derailing the car and causing approximately 40 other cars to derail in or near East Palestine, Ohio ("Derailment").

3

19. Approximately 11 of the derailed cars were carrying abnormally dangerous and/or ultrahazardous chemicals known to be carcinogens by the Environmental Protection Agency ("EPA"), including, but not limited to, polyvinyl, polyethylene, vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, benzene, and butyl acrylates ("Toxic Chemicals").

20. According to employees familiar with this matter, widespread concerns existed that night among workers on Train 32N regarding the train's excessive length and weight -- approximately 151 cars, 9,300 feet long, and 18,000 tons. Additionally, Train 32N was backloaded with 40% of its weight, the heaviest tanker cars, at the rear.

21. Upon information and belief, Norfolk Southern was aware of the increased risks of a dangerous event occurring with Train 32N prior to its derailment but intentionally acted -- and instructed others to act -- in violation of its own internal safety or operating procedures.

22. Upon information and belief, Norfolk Southern was aware − and had advance notice -- that the personnel working on Train N32 were not adequately prepared to mitigate or prevent the derailment on February 3, 2023, nor to comply with the companies' own internal or externally stated safety protocols.

23. All of these factors contributed to both the initial breakdown and the Derailment.

24. The immediate result of the Derailment was that millions of pounds of Toxic Chemicals were released into the air -- including directly onto Plaintiff's residence.

**Norfolk's Response Compounded the Derailment's Harm**

25. Norfolk failed to report the Derailment to federal authorities until approximately 10:53 p.m., nearly two hours after it occurred, in violation of applicable federal regulations. *See* C.F.R. § 225.9(a)(2)(iv).

4

26. Following the Derailment on the evening of Friday, February 3, 2023, the fire caused by the burning railcars and their contents was so large that it was detected on weather in Pittsburgh, Pennsylvania, approximately 50 miles away, for several hours. The fire's intensity appeared to peak at approximately 10:40 PM, and the resulting smoke plume extended as far as Beaver Falls, Pennsylvania.

27. Defendant failed to promptly inform firefighters and other first responders about the hazardous contents of many railcars on Train 32N. This lack of timely information impeded first responders' response, preventing them from extinguishing the fire and allowing it to spread rapidly.

28. The fire continued to burn with increasing intensity for the following days - Saturday (February 4, 2023), Sunday (February 5, 2023), and/or Monday (February 6, 2023).

29. On or about Saturday February 4, 2023, government officials issued an evacuation order for residents within a one-mile by two-mile radius of the Derailment Site ("Danger Zone") displacing thousands of residents.

30. On or about Sunday February 6, 2023, residents of Mahoning County and other surrounding communities were advised to stay indoors and shelter in place to ongoing hazardous conditions.

31. The railcars containing the Toxic Chemicals were equipped with emergency valves to vent the contents and relieve pressure, but multiples of these valves malfunctioned as a result of Defendant's poor maintenance practices.

32. On Sunday and/or Monday (February 5-6, 2023), rising temperatures and pressure within at least one railcar containing vinyl chloride, due to the malfunctioning safety valves, increased the risk of catastrophic tanker failure and explosion.

**Norfolk's Controlled Burn Caused Widespread Contamination**

33. On or about Monday February 6, 2023, at approximately 4:30 p.m., Defendant intentionally blew holes in each of the derailed cars containing vinyl chloride to drain the chemical into a trench where it was then ignited with flares to burn off the vinyl chloride in what was described as a "Controlled Release".

34. Following the Controlled Release, a massive plume of thick black smoke formed a mushroom-shaped cloud, dispersing the Toxic Chemicals into the environment  and surrounding environment (the "Controlled Burn"), thereby causing widespread contamination and exposure.

35. Defendant failed to investigate or consider safer alternatives to the Controlled Burn, instead choosing to pursue the course that would allow the railroad to re-open as quickly as possible, regardless of the risks and consequences to Plaintiff and the East Palestine community. Moreover, Defendant's failure to timely convey information to emergency responders and authorities impeded any meaningful evaluation of safer alternatives to the Controlled Burn.

36. During the resulting multi-day fire, at least three railcars containing diethylene glycol ruptured and discharged their contents into the surrounding environment.

37. The smoke from the Controlled Release and ongoing railcar fires was trapped from rising higher into the atmosphere due to an inversion layer at approximately 3,000 feet.  As a result, the toxic smoke plume, billowing smoke that spread out horizontally through East Palestine and neighboring towns in a dense, low-lying cloud.

38. In Youngstown, Ohio -- more than 20 miles from the Derailment Site -- an EPA air quality monitor detected a greater than five-fold increase in the concentration of fine particulate matter during the time of the Controlled Burn.

39. On February 10, 2023, the EPA stated that the Derailment, fire and Controlled Burn had released, and continues to release, including but not limited to, vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ethers to the air, surface soil, and surface waters.

**The Toxic Chemicals Released are Extremely Hazardous to Human Health**

40. Vinyl chloride is classified by the Department of Health and Human Services as known human carcinogen. The EPA has classified it as a Group A human carcinogenic -- the most dangerous to human health  -- by the inhalation, oral, and dermal routes of exposure. Short-term exposure to vinyl chloride can cause, including but not limited to, dizziness, nausea, headaches, difficulty breathing, lung irritation, chest pains, coughing, eye irritation, loss of consciousness. Long-term exposure creates increases significantly the risk of developing a rare liver cancer known as hepatic angiosarcoma, as well as hepatocellular carcinoma (primary liver cancer), brain and lung cancers, lymphoma, and leukemia. When vinyl chloride burns, it decomposes into highly toxic byproducts including hydrogen chloride and phosgene.  "Phosgene is highly poisonous and was used extensively during World War I as a choking agent, while hydrogen chloride is irritating and corrosive to any tissue with which it comes into contact." According to the National Transportation Safety Board ("NTSB"):  "Vinyl chloride is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride (PVC). It is a gas at room temperature but is shipped as a liquid under pressure. It is highly flammable, and vapor/air mixtures are explosive. The odor threshold for detection is approximately 3,000 parts per million (ppm) in air." The Occupational Safety and Health Administration (OSHA) regulates workplace exposure to vinyl chloride under 29 C.F.R. § 1910.1017. Specifically, paragraph (c) of the regulation mandates that no employee may be exposed to vinyl chloride at concentrations greater

than 1 ppm, averaged over any 8-hour work period; no employee may be exposed to concentrations greater than 5 ppm, averaged over any 15-minute period; and no employee may come into direct contact with liquid vinyl chloride. Because the odor threshold of vinyl chloride is significantly higher than its permissible exposure limit, individuals may be dangerously overexposed without detecting the chemical by smell. The odor threshold is therefore inadequate as a warning mechanism for hazardous conditions.

41. Butyl acrylate is a clear, colorless liquid with a sharp characteristic odor. It is used in the manufacture paints, sealants, and adhesives. Exposure can cause irritation of the eyes, skin, and upper respiratory tract.

42. Ethylhexyl acrylate is a colorless liquid used to manufacture paints and plastics. Exposure by inhalation or absorption through the skin can cause irritation and chemical burns to the skin, eyes, nose, throat, and lungs and can cause dizziness, nausea, drowsiness, and headaches.

43. Ethylene glycol monobutyl ether is a toxic, flammable, colorless liquid commonly used to manufacture paints and varnish. Its vapors are heavier than air and will spread along the ground and collect in low or confined areas such as sewers and basements. Exposure by inhalation or absorption through the skin can cause eye and respiratory tract irritation, dizziness, nausea, vomiting, and headaches.

44. Isobutylene is a highly flammable, colorless gas. Exposure by inhalation or absorption through the skin can cause irritation, dizziness, drowsiness, and unconsciousness.

45. Benzene is a colorless or yellow liquid that is highly flammable, dissolves slightly in water, has a sweet odor, and evaporates in the air very quickly. The EPA has classified it as a known carcinogen. Short-term exposure to high levels of benzene can cause drowsiness,

dizziness, unconsciousness, and death. Long-term exposure increases the risk of developing lymphatic and hematopoietic cancers, acute myelogenous leukemia, as well as chronic lymphocytic leukemia. OSHA has set limits of 1 part benzene per million (1 ppm) part of workspace air for 8-hour shifts and 40-hour work weeks.

46. In addition to the hazardous chemicals carried on Train 32N, the derailment and resulting burning of the railcars and their contents resulted in the creation and/or release of additional hazardous substances that directly impacted Plaintiff-Decedent's health.

47. Aldehydes, including but not limited to Formaldehyde, were created and/or released into the environment -- and onto Plaintiff-Decedent's residence – as a result of the derailment and burning of tanker chemicals. Formaldehyde is a compound with the formula $CH_2O$ and structure H−CHO. The pure compound is a pungent, colorless gas that polymerizes spontaneously into paraformaldehyde. The International Agency for Research on Cancer (IARC) classifies formaldehyde as a human carcinogen. In 2011, the National Toxicology Program, an interagency program of the Department of Health and Human Services, named formaldehyde as a known human carcinogen in its 12th Report on Carcinogens.

48. Polyaromatic hydrocarbons (PAHs), including benzo(a)pyrene, were also released into the environment and onto Plaintiff-Decedent's residence. PAHs are acutely toxic in humans and have been associated with increased incidences of lung, skin, and bladder cancers from occupational exposures. It has been scientifically established that PAHs, after metabolic activation in vivo, are capable of inducing mutations in oncogenes and, by inducing multiple mutations, may result in tumors.

49. Phthalates, including Bis(2-ethylhexyl)phthalates (DEHP), were created and/or released into the environment and onto Plaintiff-Decedent's residence. Phthalates are a series of

9

chemical substances, which are mainly used as plasticizers and can potentially disrupt the endocrine system. Animal studies have demonstrated that DEHP exposure resulted in liver cancer in rats and mice. The Department of Health and Human Services (DHHS) has determined that DEHP may reasonably be anticipated to be a human carcinogen. EPA has determined that DEHP is a probable human carcinogen.

50. Dioxins were created and/or released into the environment and onto Plaintiff-Decedent's residence. Dioxins are "white crystalline needles" that are invisible to the eyes and generally disperse and attach to soil and dust particles. Dioxins are highly toxic and carcinogenic, and they can also cause reproductive and developmental problems, damage to the immune system, and can disrupt normal hormonal function. As put by a Carnegie Mellon University Chemistry Professor: [v]inyl chloride is bad, dioxins are worse" as dioxins are persistent environmental pollutants that may last in the ground for 60-80 years.

51. Petroleum or gasoline constituents (including ethylbenzene, toluene, and xylenes) and chlorinated solvents (tetrachloroethylene) were created and/or released into the environment and onto Plaintiff-Decedent's residence. Ethylbenzene may cause cancer in humans. It causes tumors in the kidneys, lungs, and liver of animals as well as severe inner ear damage. Exposure to toluene can cause eye and nose irritation, tiredness, confusion, euphoria, dizziness, headache, dilated pupils, tears, anxiety, muscle fatigue, insomnia, nerve damage, inflammation of the skin, and liver and kidney damage. Exposure to xylene can irritate the eyes, nose, skin, and throat. Xylene can also cause headaches, dizziness, confusion, loss of muscle coordination, and in high doses, death. The Center for Disease Control (CDC) states individuals may be harmed from exposure to toluene. is a colorless liquid with a mild, chloroform-like odor. Exposure to

tetrachloroethylene may cause irritation of the eyes, skin, nose, throat, and respiratory system. It may also cause liver damage and is a potential occupational carcinogen.

**Plaintiff-Decedent was injured and died from the chemical spillage and burn caused by the derailment.**

52. Toxic and hazardous chemicals released as a result of the derailment and subsequent burn saturated the air throughout East Liverpool and neighboring communities, including tge area surrounding Plaintiff-Decedent residence.  As a direct and proximate result of exposure to these airborne contaminants, Plaintiff-Decedent's respiratory function was severely compromised, ultimately leading to her death on July 25, 2023.

<u>**COUNT I: NEGLIGENCE**</u>

53. Plaintiff restates, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

54. Defendant had a duty of care to operate, maintain, inspect, and repair its railway and Train 32N in a reasonable manner which would not cause Plaintiff-Decedent harm while still complying with all federal statutory requirements. Defendant failed this duty.

55. Defendant had a duty of care to operate, maintain, inspect, and repair its railway and Train 32N in a manner which was consistent with its own internal safety guidelines while still complying with all federal statutory requirements. Defendant failed this duty.

56. Defendant had a duty of care to operate, maintain, inspect, and repair its railway and Train 32N in a manner which was consistent with its own externally stated safety practices while still complying with all federal statutory requirements. Defendant failed this duty.

57. Defendant knew or should have known of the dangers of the failure to operate, maintain, inspect, and repair its railway and Train 32N in a reasonable manner and that failure

11

could reasonably lead to a breach of this duty resulting in the injury and death of Plaintiff-Decedent.

58. Defendant is under a heightened duty to operate, maintain, inspect, and repair its railcars known to be used for transporting toxic and hazardous chemicals. Defendant failed this duty.

59. Defendant had control over this equipment and property at all times herein.

60. Defendant breached its duty of care to Plaintiff-Decedent by its failure to:

a) Operate, maintain, inspect, and/or repair the railway and railcars in such a way as to ensure their safe and proper operation during the ordinary course of business, particularly while transporting toxic and hazardous materials;

b) Ensure proper procedures, alarms, and/or other systems for timely monitoring malfunctions of the railway and railcars to prevent or mitigate derailments, particularly while transporting toxic and hazardous materials;

c) Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars, particularly while transporting toxic and hazardous materials;

d) Ensure a proper mechanism for stopping or mitigating malfunctioning railcars in a timely manner without derailment, particularly while transporting toxic and hazardous materials;

e) Avoid and/or prevent overloading the train with excessive railcars or materials;

f) Load the railcars consistent with the accepted practice;

g) Load the railcars to avoid placements of the heavier cars in the rear, or "backloading", with particular consideration to whether the planned route is downhill;

h) Ensure to have an adequate number of staff for purposes of planning, coordinating, overseeing, and monitoring the transportation of toxic and hazardous materials by railcar;

i) Hire, train, manage, and supervise its agents, servants, employees, including but not limited to, the train engineer and dispatcher concerning the operation of Train 32N at the time of the Derailment;

j) Properly and adequately determine the qualifications, skill, and capabilities of its agents, servants, employees, including but not limited to, the train engineer and dispatcher concerning the operation of Train 32N at the time of the Derailment;

k) Ensure that its agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained, particularly while transporting toxic and hazardous materials;

l) Properly instruct and adequately train its agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the safety and emergency procedures in the event of a possible derailment;

m) Route railcars transporting toxic and hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

12

n) Adequately warn those in danger of exposure to toxic and hazardous materials;

o) Institute proper procedures and training for response to the mechanical malfunction of a railcar;

p) Institute proper procedures and alarms to identify and address fire on a railcar that contains toxic and hazardous materials;

q) Institute proper procedures and training for response to a derailment of railcars, particularly while transporting toxic and hazardous materials;

r) Institute proper procedures to avoid exposing toxic and hazardous materials to the environment;

s) Implement or have an emergency response plan to contain the spread of toxic and hazardous materials into the surrounding air, water, property, and persons in the event of a derailment;

t) Institute proper procedures for timely notifying the appropriate governmental authorities in the event of a derailment;

u) Timely implement an emergency-response plan in the event of a derailment;

v) Transport and handle toxic and hazardous materials so as to not cause harm to Plaintiff Decedent, as she was a foreseeable victims located within the Danger Zone of Defendant conduct;

w) Properly dispose of or otherwise eliminate the toxic and hazardous materials from the derailment site, including but not limited to the use of techniques that further exposed Plaintiff-Decedent to these said toxic and hazardous chemicals;

x) Evacuate an appropriate geographical radius to avoid exposing individuals to toxic and hazardous materials and causing further injuries and/or damages;

y) Accurately make known the risk of catastrophic injury and illness from exposure to these toxic and hazardous materials to individuals at risk of exposure, including those outside the evacuation zone;

z) Reasonably pack, transport, maintain, dispose of, or otherwise handle these toxic and hazardous materials; and

aa) Otherwise unreasonably causing injury to Plaintiff-Decedent in ways further investigation and discovery will reveal; and

bb) Defendant have violated provisions of the Code of Federal Regulations.

61. Defendant owed and breached a duty of reasonable care commensurate with the risk of transporting toxic and hazardous materials by railcar.

62. Defendant owed and breached a duty of reasonable care commensurate with the release and burning of toxic and hazardous materials.

63. Defendant prioritized the immediate resumption of its train operations over, and to the detriment of, taking the immediate and necessary steps to address the hazardous nightmare unleased on Plaintiff-Decedent.

13

64. The injury and death of Plaintiff-Decedent was caused by and/or hasted by the fact that Defendant failed to take necessary actions to mitigate the dangers associated with its operations.

65. As a direct and proximate result of Defendant's discharge, disposal, distribution, and release of toxic and hazardous materials throughout the area where Plaintiff lived, Plaintiff was injured and died on July 25, 2023.

66. Defendant's conduct as alleged herein shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff' health and wellbeing as to warrant imposing punitive damages.

67. As a direct and proximate result of Defendant's negligence, Plaintiff sustained injuries and died on July 25, 2023.

## COUNT II: STRICT LIABILITY

68. Plaintiff restates, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

69. Defendant is strictly liable for the injuries and death suffered by Plaintiff-Decedent pursuant to the provisions of the Restatement (Second) of Torts § § 519 and 520.

70. At all times relevant to this action, Defendant was the owner and operator of Train 32N.

71. At all times relevant to this action, Defendant had supervision, custody, and control of Train 32N.

72. At all times relevant to this action, Defendant were under a continuing duty to protect the Plaintiff-Decedent from the toxic and hazardous materials.

73. The transportation of these toxic and hazardous materials, including but not limited to vinyl chloride, is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts § § 519 and 520.

74. Defendant engaged in an abnormally dangerous and/or ultra-hazardous activity for which common law strict liability applied for transporting hazardous substances which Defendant knew to be dangerous and failing to take proper precautions.

75. Had Defendant not engaged in the abnormally dangerous and/or ultra-hazardous activity, Plaintiff-Decedent would not have been injured and ultimately died from Contamination and exposed to dangerous levels of these toxic and hazardous materials.

76. The harm and death to Plaintiff-Decedent was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting toxic and hazardous materials in close proximity to residential, commercial, and agricultural areas.

77. Defendant's operations and toxic discharges were a direct factor in causing the death Plaintiff-Decedent.

78. As a direct and proximate result of Defendant's acts or omissions in the course of conducting this abnormally dangerous and/or ultra-hazardous activity, Plaintiff died on July 25, 2023.

79. Defendant is strictly liable, jointly and severally, without regard to fault, for the death of Plaintiff-Decedent, which was a direct and proximate result of the Derailment and release of toxic and hazardous materials.

80. Defendant's conduct as alleged herein shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff-Decedent's rights so as to warrant imposing punitive damages.

15

81. As a direct and proximate result of Defendant's abnormally dangerous activity, Plaintiff-Decedent was injured and died, while Defendant acted in volition of law and in conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm. Therefore, the Defendant is liable for exemplary and punitive damages

## **COUNT III: TRESPASS**

82. Plaintiff restates, realleges, and incorporate by reference the preceding paragraphs as if fully set forth herein.

83. Defendant, through its tortious conduct alleged herein, caused and/or allowed dangerous chemicals to enter and contaminate Plaintiff-Decedent's residence.

84. Defendant knew or should have known that the chemicals being transported were hazardous and harmful to individuals, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these toxic and hazardous materials would cause injury and death to Plaintiff-Decedent.

85. Defendant intentionally, knowingly, and/or negligently discharged and released highly toxic chemicals near Plaintiff-Decedent's residence.

86. Defendant, through its activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials to enter and contaminate the air near Plaintiff-Decedent's residence and through its actions intentionally causing her injury and ultimate death -- and did so knowingly, and/or reckless disregard to her health and wellbeing.

87. Defendant intentionally, knowingly, negligently, carelessly, and/or recklessly caused a trespass in the following manners:

a) by discharging through the Derailment and resulting fires pollutants, particulates, oily residue, and chemicals to release into the air, and water; and

16

b) by allowing or causing such chemicals to discharge, seep, or migrate in such a manner that it was reasonably foreseeable that the toxic material would reach the residence of Plaintiff Decedent and cause her injury and death.

88. At all times, Defendant's conduct displayed indifference to and disregard for Plaintiff-Decedent's right to enjoy the safe home environment.

89. Defendant's conduct invaded the residence of Plaintiff-Decedent and injuring her and caused her death.

90. The discharge of toxic and hazardous materials near Plaintiff-Decedent's residence saturated it with plumes of offensive emissions, pollutants, and harmful chemicals which injured her and ultimately caused her death.

91. The discharge of toxic and hazardous materials entered, invaded, and intruded into Plaintiff-Decedent's residence without her privilege, permission, consent, authorization, invitation, or justification.

92. Defendant's intentional, knowing, and negligent contamination of Plaintiff-Decedent's residence injured her and caused her death on July 25, 2023.

## COUNT IV: WILLFUL AND WANTON CONDUCT

93. Plaintiff restates, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

94. Defendant owed Plaintiff-Decedent a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff-Decedent.

95. Upon information and belief, Defendant were aware that they were transporting materials that were highly toxic, carcinogenic, mutagenic, and/or otherwise harmful to human beings, animals, and the environment.

17

96. Upon information and belief, Defendant were aware that transporting, releasing, and igniting substances that were highly toxic, carcinogenic, mutagenic, and/or otherwise harmful to individuals, animals, and the environment could result in unreasonably dangerous emission of toxic and hazardous materials into the surrounding communities.

97. Defendant knew or should have known that at least one railcar was malfunctioning and/or on fire for at least 20 miles before the Derailment.

98. Upon information and belief, Defendant violated 49 CFR § 215.115(a) for at least 20 miles by allowing a defective wheel bearing to remain in service before the Derailment.

99. Despite this knowledge, and contrary to federal and standard industry practices and procedures, Defendant breached its duties as described in Count I above.

100. Defendant's failures to exercise any care toward Plaintiff-Decedent as described in Count I above and other respects constitute willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard for the Plaintiff-Decedent's health, safety, and well-being.

101. The failures to exercise any care toward Plaintiff-Decedent occurred under circumstances for which the probability of harm was great, and the probability of harm was known to Defendant.

102. Through its unreasonable and dangerous actions and omissions described above, Defendant intentionally deviated from a clear duty or definite rule of conduct, acted with a deliberate purpose not to discharge a duty necessary to safety, or purposely performed wrongful acts with knowledge and appreciation of the likelihood of resulting injury.

103. As a direct and/or proximate result of Defendant's willful, wanton, reckless and

18

outrageous transportation, emission, discharge, and release of toxic and hazardous materials near Plaintiff-Decedent's residence, she was injured and ultimately died.

105. Defendant's conduct as alleged herein shows that Defendant acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff-Decedent's rights so as to warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant as follows:

for Count I, compensatory damages in an amount to be determined at trial, but in any event not less than $250,000.00;

for Count II, compensatory damages in an amount to be determined at trial, but in any event not less than $250,000.00;

for Count III, compensatory damages in an amount to be determined at trial, but in any event not less than $250,000.00;

for Count IV, compensatory and punitive damages, attorney's fees, and costs in an amount to be determined at trial, but in any event not less than $250,000.00;

Plaintiff further demands a trial by jury.

*/s/ Irene K. Makridis*
Irene K. Makridis, 0016760
Theo Kafantaris, 0081688
Dimitrios N. Makridis, 0089131
Attorneys for Plaintiff
183 W. Market Street, Suite 200
Warren, OH  44481
T: (330) 394-1587 | F: (330) 394-3070
office@makridislaw.com
